ANDREW J. ENTWISTLE (*Pro Hac Vice* submitted)
aentwistle@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
401 Congress Avenue, Suite 1170
Austin, TX  78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7272

ROBERT N. CAPPUCCI (*Pro Hac Vice* submitted)
rcappucci@entwistle-law.com
JOSHUA K. PORTER (*Pro Hac Vice* submitted)
jporter@entwistle-law.com
ANDREW M SHER (*Pro Hac Vice* submitted)
asher@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 20th Floor
New York, NY  10171
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Albert Holzmacher; Michael Wood; and Tate Wood, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | |
| Nikola Corporation; Trevor R. Milton; Mark A. Russell; Kim J. Brady; Stephen J. Girsky; and Steven M. Shindler, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Case No. .

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

JURISDICTION AND VENUE ........................................................................... 4

PARTIES ............................................................................................................. 5

    A.  Plaintiffs ................................................................................................. 5

    B.  Defendants .............................................................................................. 5

SUBSTANTIVE ALLEGATIONS ...................................................................... 7

    A.  Nikola Is Founded and Grows Based on a Series of Deceptive
         Statements ...................................................................................... 7

    B.  VectoIQ Defrauds Investors to Complete the Business Combination ............. 10

    C.  Nikola Seeks Validation Through a Deal with General Motors ...................... 11

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
    OF MATERIAL FACT ............................................................................. 15

THE TRUTH EMERGES ................................................................................... 25

PLAINTIFFS' CLASS ACTION ALLEGATIONS ............................................ 26

COUNT I  FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT
    AND RULE 10B-5  PROMULGATED THEREUNDER, AGAINST
    NIKOLA, MILTON, RUSSELL, BRADY, GIRSKY AND SHINDLER ........... 29

COUNT II  VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
    AGAINST THE INDIVIDUAL DEFENDANTS .................................................. 31

COUNT III VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT
    AGAINST NIKOLA AND GIRSKY .................................................................. 31

PRAYER FOR RELIEF ..................................................................................... 33

JURY TRIAL DEMANDED .............................................................................. 34

Plaintiffs Albert Holzmacher, Michael Wood and Tate Wood (collectively, "Plaintiffs") bring this securities class action (the "Action") for violations of:

(i) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against Nikola Corporation ("Nikola") and certain of its current and former officers and directors (collectively, the "Defendants") on behalf of themselves and all persons or entities, excluding Defendants, that purchased or otherwise acquired the securities of Nikola f/k/a VectoIQ Acquisition Corp. ("VectoIQ") from March 3, 2020 through October 15, 2020, inclusive (the "Class Period") and were damaged thereby (the "Class"); and

(ii) Sections 14(a) and 20(a) of the Exchange Act on behalf of themselves and all other shareholders of VectoIQ as of the May 8, 2020 record date (the "Record Date") that were entitled to vote on VectoIQ's proposed transaction (the "Business Combination") with Nikola.

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on an investigation conducted by and through Plaintiffs' counsel, which included, among other things, consultation with experts and a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, investor presentations, earnings calls, analyst research publications and media reports concerning VectoIQ and Nikola.

Counsel's investigation into the facts supporting the claims alleged herein continues, and many of the relevant facts are known only to Defendants, or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth herein will be uncovered after a reasonable opportunity for further investigation and discovery of Defendants.

**INTRODUCTION**

1.     Plaintiffs bring this Action on behalf of persons who purchased the securities of Nikola f/k/a VectoIQ during the Class Period and/or held Nikola common stock on the Record Date to vote on the Business Combination.  Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws in connection with:  (i) VectoIQ's false and misleading statements and omissions of material facts in its May 8, 2020 proxy statement ("Proxy"[1]) seeking shareholder approval of the Business Combination with Nikola; and (ii) public Class Period statements issued by Defendants concerning, among other things, Nikola's purported fuel cell and battery technology, development of electric vehicles and ability to produce hydrogen at less than 80% of the cost of its competitors.

2.     VectoIQ was created in 2018 as a Special Purpose Acquisition Vehicle ("SPAC"), or "blank check" company, by former General Motors Company ("GM") Vice Chairman Stephen Girsky for the purpose of effectuating a transaction in the transportation or smart mobility industries.  On March 3, 2020, VectoIQ announced its plan to merge with privately-held electric vehicle startup Nikola in a transaction valued at $3.3 billion.

3.     The Business Combination was completed on June 3, 2020.  After it became a public company, Nikola's stock price skyrocketed, particularly after Nikola announced on September 8, 2020 it had reached an agreement with GM to partner on an electric pick-up truck called the "Badger."  However, just months after the transaction closed – and days after the announcement of the GM partnership – catastrophic doubts about Nikola's highly-touted technology were raised in a report issued by analyst firm Hindenburg Research ("Hindenburg").  Among other things, Hindenburg exposed that:

(i) Nikola induced certain international auto companies, including GM, to enter into well-publicized partnerships based upon false information;

---

[1] This definition includes all supplements to Nikola's May 8, 2020 proxy statement.

(ii) Nikola's claims (a) it had reduced the cost of hydrogen production by approximately eighty percent compared to its peers and (b) that it was already producing hydrogen on that basis were false;

(iii) the Company's advertisements concerning its vehicles' purported ability to function on their own power and use the Company's proprietary technology were fraudulent;

(iv) Nikola's promotional video, entitled "Nikola One in Motion," falsely portrayed its semi-truck cruising on a road at a high rate of speed, when the truck was actually being towed to the top of a hill on a remote stretch of highway and was simply filmed rolling down the hill;

(v) the Company's contentions regarding outstanding orders for its vehicles were materially overstated;

(vi) Nikola's assertion that it designs all key components in-house, rather than buying or licensing them from third parties, was false and misleading; and

(vii) Nikola's statements about the purported battery technology it planned to acquire from ZapGo Ltd. ("ZapGo") were knowingly misleading.

4.     Following the publication of the Hindenberg report, Nikola's **stock price dropped approximately 24%** in just two days, costing investors **over $4 billion**. Specifically, Nikola's stock price dropped from $42.37 per share on September 9, 2020 to $37.57 per share on September 10, 2020.  Nikola's stock continued to decline the following day as additional details concerning the alleged wrongdoing came to light, closing at $32.13 per share on September 11, 2020.

5.     In light of the claims by Hindenberg and other revelations, both the SEC and U.S. Department of Justice ("DOJ") initiated investigative probes into whether Nikola misrepresented the progress it had made in developing key technology critical to its hydrogen powered vehicles.

6.     On September 15, 2020, Nikola responded to Hindenburg's report. Remarkably, Nikola **conceded** certain of the report's key allegations, including that the

truck featured in the Company's "Nikola In Motion" promotional video was merely rolling down a hill and was not operating on its own power.

7.    Days later, on September 20, 2020, reports revealed that Nikola's founder and executive chairman Trevor Milton was stepping down from his role effective immediately and that Defendant Girsky was replacing Milton as executive chairman.  On the trading day following the announcement, September 21, 2020, *Nikola's stock price closed down more than 19% from the previous day's close.*

8.    Not surprisingly, Nikola's planned agreement with GM to collaborate on the Badger pick-up truck did not close at the end of September 2020 as expected, and reports indicated GM was seeking to renegotiate more favorable terms.  On October 15, 2020 and October 16, 2020, Defendant Russell indicated in several interviews that Nikola's partnership with GM might fall through.  For example, Defendant Russell stated "[w]e have the ability and we have a base plan of doing it ourselves. If we have a partner, that just enables us to consider going faster and helps reduce the risk . . . [w]e've proven that over the years that we are a partnership company when those things are available to us." Following Russell's comments, Nikola's stock price fell approximately 16%, from $23.30 per share on October 15, 2020 to $19.55 per share on October 16, 2020.

9.    Plaintiffs bring this action to recover losses from purchases made while Defendants knew but did not disclose the truth regarding Nikola's purported fuel cell and battery technology, development of electric vehicles and ability to produce hydrogen at a significantly reduced price.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78(n) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  The Company is also headquartered in this district.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district and the Company is based in this district.

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.  Defendants disseminated the statements alleged to be false and misleading herein into this district, and Defendants solicited purchasers of Nikola securities in this district.

<u>**PARTIES**</u>

**A.  Plaintiffs**

15.     Plaintiff Albert Holzmacher, as set forth in the attached certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

16.     Plaintiff Michael Wood, as set forth in the attached certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

17.     Plaintiff Tate Wood, as set forth in the attached certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

**B.  Defendants**

18.     Defendant Nikola Corporation purports to be a the zero-emissions vehicle company.  Specifically, Nikola purportedly designs and manufactures battery-electric and

hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen fueling station infrastructure. Defendant Nikola is incorporated in Delaware and maintains its principal executive offices at 4141 E. Broadway Road, Phoenix, Arizona 85040. The Business Combination of VectoIQ and Nikola closed on June 3, 2020. The Company's shares are listed on NASDAQ under the ticker symbol "NKLA" and formerly traded under the ticker symbol "VTIQ" until the merger in June 2020.

19.     Defendant Trevor R. Milton is the founder of Nikola and served as executive chairman and a director of Nikola during the Class Period until his voluntary departure from the Company on September 20, 2020. Defendant Milton issued numerous false and misleading statements following the closing of the Business Combination through SEC filings, Twitter and other public media channels.

20.     Defendant Mark A. Russell has served as the chief executive officer of Nikola since June 2020. Prior to that position, Russell served as the president of Nikola since July 2019. Russell is also a director of Nikola. Defendant Russell signed Nikola's second quarter 2020 Form 10-Q dated August 4, 2020, which contained false and misleading statements and omissions of material facts.

21.     Defendant Kim J. Brady has served as the chief financial officer and treasurer of Nikola since November 2017. Defendant Brady signed Nikola's second quarter 2020 Form 10-Q dated August 4, 2020, which contained false and misleading statements and omissions of material facts.

22.     Defendant Stephen J. Girsky served as the chief executive officer of VectoIQ during from January 2018 through the competition of the Business Combination in June 2020. Following the merger, Defendant Girsky has served as a director of Nikola and since September 20, 2020, has served as the chairman of the board of directors of the Company. Girsky is the former vice chairman of GM. Defendant Girsky signed VectoIQ's annual report dated March 6, 2020 and the Proxy, both of which contained materially false and misleading statements and omissions of material facts.

23.    Defendant Steven Shindler served as the chief financial officer of VectoIQ during the Class Period until the merger in June 2020.   Defendant Shindler signed VectoIQ's annual report dated March 6, 2020, which contained materially false and misleading statements and omissions of material facts.

24.    Defendants Milton, Russell, Brady, Girsky and Shindler are collectively referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**A. Nikola Is Founded and Grows Based on a Series of Deceptive Statements**

25.    Nikola, originally known as Bluegentech LLC, is an electric vehicle company founded by Trevor Milton in 2014.  The Company was originally focused on natural gas-powered vehicles and claimed it was "10-15 years ahead" of any other natural gas vehicle company.  However, in 2016, the Company pivoted to hydrogen-powered vehicles while contending that hydrogen batteries are the future of electric vehicles because hydrogen can be produced from water and potentially have range and fueling time advantages over other types of electric vehicles.

26.    Nikola has advertised a series of hydrogen fueled vehicles, including the Nikola One, Nikola Two, Nikola Tre, Nikola Reckless and most recently the Nikola Badger. The Nikola One, Nikola Two and Nikola Tre are semi-trucks that were announced starting in 2016 (the Nikola Tre is the European semi-truck model).  The Nikola Reckless is an off-road vehicle, while the Badger is a pickup truck.

27.    In addition to developing and manufacturing vehicles, Nikola claims it will launch and operate a network of at least 700 hydrogen stations across the country that will allow consumers to refuel their vehicles.  Accordingly, Nikola's ability to produce low-cost hydrogen is critical to the Company's business model.

28.    Since at least 2016, Nikola has promoted its hydrogen technology and vehicles based on a series of apparent misleading representations, as described below.

29.    <u>Nikola One Unveiling</u>. In December 2016, Nikola unveiled its Nikola One truck and claimed at the time the vehicle was "functioning" and "fully built" using a

hydrogen motor.  Indeed, Nikola's CEO, Defendant Milton, stated in an interview regarding the event that Nikola will "have a chain on the seats to prevent people from coming in just for the safety . . . I don't want someone to end up doing something and driving this truck off the stage."  Milton further stated about the Nikola one that "This thing fully functions and works, which is really incredible."  However, internal emails and behind-the-scenes photos have revealed the truck was far from drivable, and the dashboard displays were powered by a cable under the stage.

30.    <u>Nikola One in Motion Video</u>.  In January 2018, Nikola released a highly touted promotional video purportedly showing the Nikola One fully functioning on actual roads.  However, the Nikola One was not actually functioning on its own, but was simply towed up a remote hill in Utah and rolled down in neutral creating the false appearance that the truck functioned on its own power.  Nikola has appeared to concede the truck was merely rolling down the hill, arguing the video was not misleading because it only said the truck was "in motion."

31.    <u>Nikola's Hydrogen Production</u>.  In addition to Nikola's representations regarding its vehicles and batteries, Nikola claims it is launching a network of hydrogen facilities around the country purportedly using cheap hydrogen produced by the Company. In a June 2020 interview, Milton stated that its headquarters in Arizona can produce over 1,000 kilograms a day on-site at less than $4/kilogram.  In a subsequent July 2020 interview, Milton claimed Nikola had cut the cost of hydrogen to $3/kilogram – more than 80% less than the market price of hydrogen.  However, in reality, Nikola does not produce any hydrogen, let alone hydrogen at ultra-competitive prices.  Instead, Nikola's Arizona headquarters merely stores and distributes hydrogen that is not produced on-site.

32.    <u>Components Developed by Nikola</u>.  Nikola's press releases dating back to May 2016 highlight that "the majority of the semi-trucks components are being developed by Nikola."  However, Nikola purchases most of its components, including inverters, and the Company has attempted to conceal this fact by using adhesive tape to cover the names

of manufacturers. In addition, the original design for Nikola's flagship truck, the Nikola One, was purchased by founder Trevor Milton from a designer in Croatia.

33. <u>Key Battery Technology Was Not Real</u>. Nikola has repeatedly advertised that it had developed "game changing" high-density battery technology. This technology is supposed to be the key to designing efficient hydrogen powered vehicles. However, Nikola did not develop this technology but instead planned to acquire it from another company, ZapGo Ltd ("<u>ZapGo</u>"). That acquisition fell through after Nikola discovered the technology did not exist and ZapGo's founder was recently indicted for tax fraud. In addition, *The Wall Street Journal* reported on September 21, 2020 that Nikola's initial trucks will use batteries developed by Romeo Systems, not by Nikola.

34. <u>Overstated Orders</u>. While Nikola does not yet have any meaningful revenues, Nikola claims it has orders for its semi and pickup trucks, including over 7,000 preorders with deposits. But the Company has since refunded customers that placed preorders. Moreover, Nikola claims to have 14,600 orders from U.S. Xpress, a company that only appears to have $1.3 million cash on hand and likely will not be able to pay for Nikola's vehicles.

35. <u>Nikola's "Best Team In The World"</u>. Nikola and Milton have repeatedly claimed the Company has assembled one of the best management teams in the world. However, Nikola's "Director of Hydrogen Production" is Milton's brother, Travis Milton, whose background is in small construction jobs. Similarly, Nikola's "Head of Infrastructure Development" is Dale Prows, who appears to have minimal relevant qualifications and instead spent his career managing a golf course in Idaho.

36. None of these issues were adequately disclosed to investors in connection with the Proxy or otherwise. As detailed below, based on the Company's misstatements and omissions Nikola was able to generate significant excitement as a possible competitor to Tesla and enter into numerous profitable deals with investors and partners in the auto industry.

**B.  VectoIQ Defrauds Investors to Complete the Business Combination**

37.     VectoIQ was a SPAC formed by its sponsor VectoIQ Holdings LLC as well as anchor investors Cowen Investments LLC ("Cowen") and certain funds managed by Blackrock, Inc. ("Blackrock").  SPACs are formed with no existing business or operations, and thereafter engage in a merger or acquisition with a previously unidentified company, entity or person.  VectoIQ was originally led by Defendant Girsky, former GM Vice Chairman, and was created to effectuate a transaction in the transportation or smart mobility industries – Girsky's purported area of expertise.

38.     On May 18, 2018, VectoIQ made its initial public offering ("IPO") of 20,000,000 units at a price of $10.00 per unit, resulting in gross proceeds of $200,000,000. Each VectoIQ unit consisted of one share of VectoIQ's common stock and one redeemable warrant.

39.     As is typical with blank check companies, the terms of VectoIQ's IPO offering materials required it to complete an initial business combination within 24 months or return all of its IPO proceeds to investors.  Accordingly, as with most SPACs, VectoIQ's management was incentivized to spend the IPO proceeds no matter what so they could realize fees and receive salaries and stock options from the combined company, rather than lose the time and expenses spent on the IPO.  In this regard, Ben Dell, managing partner of investment firm Kimmeridge Energy, has stated that "SPACs are the most egregious example in the industry of executive misalignment with investors."

40.     Following its IPO, VectoIQ purportedly conducted an extensive search for a transaction partner, including considering and evaluating 85 potential targets, reviewing illustrative transaction structures relating to 16 of such potential acquisition targets and submitting non-binding letters of intent to six potential acquisition targets.  Despite these efforts, by November 2019 – 18 months after the IPO and six months before having to return the IPO proceeds – VectoIQ was desperate to complete a qualifying transaction.

41.     During the week of November 18, 2019, anchor investor Cowen's investment banking division discussed with VectoIQ management the idea of Nikola as a potential

business combination target.  Cowen was familiar with Nikola from providing financial advisory services to the company in connection with the sale of its Series C Preferred Stock in 2018.

42.    On March 3, 2020, VectoIQ announced its proposed Business Combination with Nikola and subsequently issued the Proxy for investors to vote on the transaction.  The transaction valued Nikola at $3.3 billion and was funded through a combination of VectoIQ's cash in trust and a $525 million private placement of common stock, led by institutional investors Fidelity Management & Research Co., ValueAct Spring Fund and P. Schoenfeld Asset Management.  The transaction would purportedly allow Nikola to accelerate production of its electric vehicles, break ground on its manufacturing facility and begin its hydrogen station infrastructure rollout.

43.    VectoIQ issued a Proxy in order to induce shareholders to vote in favor of the Business Combination.  VectoIQ made numerous misrepresentations in the Proxy and other public statements, regarding, among other things, Nikola's:  (i) progress developing fuel cell and car battery technology; (ii) timeline for production of vehicles; (iii) ability to produce low-cost hydrogen; (iv) order book and deposits for its pick-up truck; and (v) senior management teams experience.  The Proxy also misled investors regarding whether Nikola produced its own parts by stating Nikola "designs and manufacturers state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems and hydrogen fueling stations" and that Nikola is "capable of designing, building and testing prototype vehicles in-house."

44.    Ultimately, efforts to induce shareholders to vote in favor of the Business Combination succeeded when at the special shareholder meeting on June 2, 2020 more than 19 million of VectoIQ's 20 million shareholders voted in favor of the transaction.

**C.  Nikola Seeks Validation Through a Deal with General Motors**

45.    Following the closing of the Business Combination, Nikola and Milton continued to mislead investors, consumers and partners while allowing the Company's early investors to cash out, including misstatements that:  (i) Nikola's batteries and fuel cells "are

Case No.

real" and "years ahead" of the competition.  (May 15, 2020);  (ii) all of Nikola's "technology, software, controls, E axle, inverters etc." are made internally (June 6, 2020); (iii) in Nikola's trucks, "all internals are Nikola's IP; batteries, inverters, software, ota, infotainment, controls, etc.  We own it all in house." (July 1, 2020); (iv) Nikola's truck can reach 0-60 in under 5 seconds.  (July 15, 2020); (v) "[w]e have 5 units coming off assembly line now in Ulm Germany."  (July 22, 2020); and (vi) "[w]e currently make our own green H2 for under $4 /kg."  (August 13, 2020).

46.     While continuing to mislead investors, in July 2020, Nikola redeemed all of its outstanding warrants.  In addition, Nikola's lock-up agreement with the investors that purchased shares through the private placement reveals those investors are allowed to start selling shares as soon as December 2020.

47.     On July 8, 2020, Worthington Industries ("Worthington") – an early investor in Nikola – sold 5 million of its 19.048 million Nikola shares for $237.8 million. Worthington can sell another 7 million shares 90 days after the June 3, 2020 Business Combination (i.e. October 1, 2021).  Milton, who was allowed to start selling some shares just 30 days after the Business Combination, can sell $70 million worth of shares starting on January 31, 2021.

48.     In addition to misleading investors, Nikola was also able to benefit from its alleged deception by negotiating favorable partnership deals.  On September 8, 2020, Nikola announced a strategic manufacturing partnership with GM, sending shares of both companies sharply higher.  As part of the announced deal, GM would receive $2 billion in Nikola stock (an 11% stake in the Company) for non-cash contributions such as engineering a truck for Nikola, $700 million in expense reimbursements, supply contracts and 80% of the electric vehicle government credits, along with a host of ways to exit the agreement. Pursuant to the GM/Nikola deal, the parties will be using *GM's battery technology*, despite Nikola's prior claims of owning "game changing" battery and fuel cell technology.

49.     As a result of the Hindenberg report and subsequent disclosures, the GM agreement did not close in late September as expected.  Reports indicate that the parties are

re-negotiating the agreement, and analysts predict as a result of the renegotiation, GM will receive a larger equity stake in Nikola.

50.    Just days after the GM announcement, Hindenberg released its short report concluding that "Nikola is an intricate fraud" and that the short analyst firm has "never seen this level of deception at a public company, especially of this size." The Hindenberg report alleges that Nikola not only tricked investors, but also fooled its partners, including GM.

51.    Following the publication of Hindenburg's report, Nikola's stock price dropped from $42.37 per share on September 9, 2020 to $37.57 per share on September 10, 2020. Nikola's stock continued to decline the following day as additional details concerning the wrongdoing came to light, closing at $32.13 per share on September 11, 2020.

52.    On September 11, 2020, the day after the report was released, Nikola and Milton issued a terse denial of Hindenburg's claims. The Company also announced Nikola had retained outside legal counsel to voluntarily reach out to the United States Securities Exchange Commission ("SEC") to discuss the matter.

53.    On September 14, 2020, Nikola published a more detailed rebuttal to Hindenburg's report. However, instead of refuting Hindenburg's claims, Nikola offered additional facts – essentially admitting many of the claims.

54.    Among other things, Nikola's response to the Hindenberg report admitted that: (i) the truck featured in its "Nikola in Motion" video was not operating on its own power; (ii) Nikola is not yet producing hydrogen, and certainly not at 80% the cost of its competitors; (iii) Nikola's Tre Trucks are indeed not "coming off the assembly line right now" and will not be available until late 2021; and (iv) Nikola does use third party inverters and is only currently "working on its own inverters." In total, Nikola only responded to 10 of the 53 questions posed at the end of Hindenburg's report.

55.    In the days following the release of the Hindenberg report, many of Nikola's partners, including GM and Bosch, issued statements ostensibly supporting Nikola. For

example, GM stated on September 14, 2020 that it conducted "appropriate due diligence" concerning Nikola including a "thorough review of business, legal and technical matters."

56.     In any event, on September 14 and 15, 2020, reports surfaced that the SEC and DOJ are investigating Nikola's representations.  The DOJ inquiry is being handled by the U.S. Attorney's Office for the Southern District of New York, working in concert with the SEC.  Press reports indicate the DOJ and SEC probes are focused on whether Nikola misrepresented progress it made in developing key fuel cell and battery technology.

57.     Following Nikola's rebuttal and the Company's partners' continued endorsement, the Company's stock price partially recovered on September 14, 2020, to close at $35.79 per share.  However, following news of the SEC and DOJ investigations, Nikola's shares fell again to close at $32.83 per share on September 15, 2020.

58.     Media reports on Sunday, September 20, 2020 revealed that Nikola's founder and executive chairman, Trevor Milton, was departing the Company effective immediately. Nikola confirmed the reports and announced that its board had appointed Defendant Girsky as chairman.  The following morning, September 21, 2020, Nikola's stock price fell to as low as $26.66 per share.  Hindenberg commented on Milton's departure, stating "[w]e think this is just the beginning."

59.     On October 15, 2020 and October 16, 2020, Defendant Russell indicated in several interviews that Nikola's partnership with GM could fall through.  For example, Defendant Russell stated "We have the ability and we have a base plan of doing it ourselves. If we have a partner, that just enables us to consider going faster and helps reduce the risk," he said. "We've proven that over the years that we are a partnership company when those things are available to us."

60.     Following Russell's comments regarding the GM partnership, Nikola's stock price fell approximately 16% from $23.30 per share at close on October 15, 2020 to $19.55 per share on at close on October 16, 2020.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

61.    On March 3, 2020, Nikola issued a press release, attached to VectoIQ's 8-K filing with the SEC the same day, entitled "Nikola Corporation, a Global Leader in Zero Emissions Transportation Solutions, to Be Listed on NASDAQ Through a Merger With VectoIQ" which quoted Defendants Milton and Girsky stating the following, in relevant part, regarding the Company's capabilities:

> Trevor Milton, Founder and CEO of Nikola stated: "***We are on a roll. You couldn't ask for better news for the energy and tech industry.*** The world is transitioning to zero emission platforms and Nikola is the leader for heavy duty vehicles. We believe we have a differentiated business model built on economics, not government subsidies. We now need to double down and speed up the timelines and get to market. We couldn't be happier to have Steve Girsky join our board."

> "***In our two-year quest to find a partner that was a proven technology leader*** and focused on making a global difference, Nikola was the clear winner," said Stephen Girsky, CEO of VectoIQ and former Vice Chairman of General Motors Corporation. "Nikola's vision of a zero-emission future and ***ability to execute were key drivers in our decision***."

(Emphasis added.)

62.    In connection with the merger announcement, Nikola released an investor presentation on March 3, 2020, attached to VectoIQ's 8-K filing with the SEC the same day. The investor presentation included, among other things, a presentation that touted Defendant Milton's experience in the clean energy and technology field and the Company's hydrogen production capabilities.

63.    On March 6, 2020, VectoIQ filed its yearly report on Form 10-K with the SEC for the quarter ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Girsky and Shindler.

64.    Attached to the 2019 Annual Report, via a 10-K/A filed April 15, 2020, were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants

Case No.

Girsky and Shindler attesting to the accuracy of the financial statements and the disclosure of all fraud.

65.     The 2019 Annual Report stated that its "Business Combination Criteria" was as follows:

> Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses and, in evaluating a prospective target business, *we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us*. We intend to use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria or guidelines.

> Focus on industrial technology, transportation and smart mobility business positioned to benefit from our management team's extensive experience and contacts in these sectors. We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the target industry.

> Emphasis on companies that can benefit from a public listing and access to the public capital markets. We will primarily seek a target that we believe will benefit from being publicly traded and will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

> *We will target businesses that are market leaders, with established technologies* and attractive financial metrics and/or prospects, where we believe that our industry expertise and relationships can be used to create opportunities for value creation, whether for acquisitions, capital investments in organic growth opportunities or in generating greater operating efficiencies. While this may include business with a history of revenue growth and profitability, we may also target businesses that are underperforming that that we believe can benefit from our expertise and/or technology.

> *We intend to seek target businesses that have established management teams*, but that we believe could benefit from the industry experience and contacts of our management. . . .

> These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations,

factors and criteria that our management team may deem relevant. ***In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, would be in the form of proxy solicitation materials or tender offer documents that we would file with the SEC.***

(Emphasis added.)

66.    The 2019 Annual Report also stated the following regarding the "Selection of a Target Business and Structuring of a Business Combination":

> ***In evaluating a prospective target business, our management may consider a variety of factors, including one or more of the following***:
> · ***financial condition and results of operation;***
> · growth potential;
> · brand recognition and potential;
> · ***experience and skill of management*** and availability of additional personnel;
> · capital requirements;
> · competitive position;
> · barriers to entry;
> · stage of development of the products, processes or services;
> · existing distribution and potential for expansion;
> · ***degree of current or potential market acceptance of the products, processes or services***;
> · ***proprietary aspects of products and the extent of intellectual property or other protection for products or formulas***;
> · impact of regulation on the business;
> · regulatory environment of the industry;
> · costs associated with effecting the business combination;
> · ***industry leadership, sustainability of market share and attractiveness of market industries in which a target business participates***; and
> · macro competitive dynamics in the industry within which the company competes.
>
> These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular business combination will be based, to the extent relevant, on the above factors as well as other considerations deemed relevant by our management in effecting a business combination consistent with our business objective. ***In evaluating a prospective target business, we will conduct an extensive due diligence review which will encompass, among other things, meetings with incumbent management and inspection of***

*facilities, as well as review of financial and other information which is made available to us.* This due diligence review will be conducted either by our management or by unaffiliated third parties we may engage, although we have no current intention to engage any such third parties.

(Emphasis added.)

67.    On March 13, 2020, VectoIQ filed with the SEC a prospectus on Form S-4 signed by Defendants Milton and Girsky. On April 15, 2020, May 1, 2020, and May 5, 2020, VectoIQ filed revised versions of the prospectus for the merger on Forms S-4/A. On May 8, 2020, VectoIQ issued the proxy statement with the SEC on Form 424(b)(3) which was signed by Defendant Girsky.  The Proxy stated the following as "VectoIQ's Board of Directors' Reasons for Approval of the Business Combination":

As described under "The Background of the Business Combination" above, VectoIQ's board of directors, in evaluating the Business Combination, consulted with VectoIQ's management and financial and legal advisors. In reaching its unanimous decision to approve the Business Combination Agreement and the transactions contemplated by the Business Combination Agreement, VectoIQ's board of directors considered a range of factors, including, but not limited to, the factors discussed below. In light of the number and wide variety of factors considered in connection with its evaluation of the combination, VectoIQ's board of directors did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors that it considered in reaching its determination and supporting its decision. VectoIQ's board of directors viewed its decision as being based on all of the information available and the factors presented to and considered by it. In addition, individual directors may have given different weight to different factors.

This explanation of VectoIQ's reasons for the combination and all other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors discussed under the section titled "Cautionary Note Regarding Forward-Looking Statements."

In approving the combination, VectoIQ's board of directors determined not to obtain a fairness opinion. The officers and directors of VectoIQ have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background, together with experience and sector expertise of Cowen, enabled them to make the necessary analyses and determinations regarding the Business Combination.

VectoI''s board of directors considered a number of factors pertaining to the Business Combination as generally supporting its decision to enter into the Business Combination Agreement and the transactions contemplated thereby, including, but not limited to, the following:

• ***Highly Disruptive Technology. VectoIQ's management and board of directors believe that Nikola is a market disruptor*** in an attractive and growing industry with over 70 patents issued or pending and strong growth prospects within the hydrogen fuel, BEV and FCEV sectors as well as adjacent markets;

• Strategic Partnerships. VectoIQ's management and board of directors considered Nikola's strategic partnerships with industry leaders, which it believes reduce Nikola's technology and execution risk from truck and hydrogen station development to truck sales and maintenance;

• High Demand for Product. VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion, as well as contracts with top tier customers with investment-grade credit ratings;

• Platform Supports Further Growth Initiatives. VectoIQ's management and board of directors believe that Nikola's business model uniquely supplies both the truck and hydrogen fueling infrastructure, solving the fleets' concerns as to where to refuel with green hydrogen at competitive pricing to diesel;

• ***Due Diligence. VectoIQ's management and board of directors conducted due diligence examinations of Nikola and discussions with Nikola's management and VectoIQ's financial and legal advisors concerning VectoIQ's due diligence examination of Nikola***;

• Financial Condition. VectoIQ's board of directors also considered factors such as Nikola's outlook, financial plan and debt structure, as well as valuations and trading of publicly traded companies and valuations of precedent combination and combination targets in similar and adjacent sectors (see "Certain Nikola Projected Financial Information");

• Attractive Market Valuation of Comparable Companies. The public trading market valuation of comparable "future transportation" companies (consisting of NIO, Tesla and Virgin Galactic, which we refer to collectively as the "Comparable Future Transportation Companies") have expected 2020 enterprise value/revenue multiples and enterprise value/EBITDA multiples (in each case based on market data as of February 28, 2020) ranging from 3.3x to 650+x (and a median of 4.0x) and up to 29.5x, respectively. The public

trading market valuation of comparable fuel cell technology companies (consisting of Ballard, Bloom Energy, Nel and Plug Power, which we refer to collectively as the "Comparable Fuel Cell Technology Companies") have expected 2020 enterprise value/revenue multiples and enterprise value/EBITDA multiples (in each case based on market data as of February 28, 2020) ranging from 1.7x to 14.7x (and a median of 9.5x) and up to 77.3x (and a median of 47.8x), respectively. . . . For example, when applying the median 2020 enterprise value/revenue multiple for the Comparable Fuel Cell Technology Companies of 9.5x to Nikola's 2024 projected revenue, the initial market valuation of the post-Business Combination company implies a 67.6% annual discount rate from December 31, 2024 to June 30, 2020. Since Nikola's business is not expected to achieve scale until 2024, the VectoIQ board of directors believes this present value methodology is the most reasonable method of comparison. Although this analysis is based on the current Nikola projections, the valuation multiples decline each year as a result of the high growth projected for Nikola's business;

*• Experienced and Proven Management Team. VectoIQ's management and board of directors believe that Nikola has a strong management team which is expected to remain with the combined company to seek to execute Nikola's strategic and growth goals*;

(Emphasis added.)

68.    The Proxy also stated the following, in pertinent part, regarding VectoIQ's due diligence:

*During the week of November 25, 2019, members of the management teams from both companies met at Nikola's' headquarters in Phoenix, Arizona to enable VectoIQ's management to learn more about Nikola's current and planned business.* Throughout the week the management teams also held calls to discuss scheduling for continued due diligence meetings as well as a timeline for a potential combination. During this period, VectoIQ assembled a number of industry experts to advise with respect to vehicle development, electrification, fuel cells, software, connectivity and manufacturing in connection with its due diligence efforts.

During the week of December 2, 2019, representatives of VectoIQ and Nikola held a technical due diligence call and VectoIQ had discussions with industry experts on commercial conditions in the Class 8 Hydrogen and Electrification markets.

(Emphasis added.)

69.    The Proxy stated the following, in pertinent part, regarding Nikola's hydrogen production capabilities:

Q. Who is Nikola?

A. Nikola is a vertically integrated zero-emissions transportation solution provider *that designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations*. Nikola's core product offering is centered around its battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-trucks. The key differentiator of Nikola's business model is its planned network of hydrogen fueling stations. Nikola is offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development. See "Information About Nikola."

* * *

*First Test* Station *Installed at Nikola's Phoenix HQ*

Through our partnership with Nel ASA, a Norwegian hydrogen company ("Nel"), we have initiated the development of the hydrogen station infrastructure *by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations*.

* * *

**1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION**

*Nikola Corporation ("Nikola" or the "Company") is a designer and manufacturer of battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen stations.*

The Company is also developing a network of hydrogen fueling stations to meet hydrogen fuel demand for its customers. *Fueling related activities will be conducted through the Company's wholly-owned subsidiary, Nikola Energy.*

(Emphasis added)

70.    The Proxy stated the following, in pertinent part, regarding Nikola's "in-house" designing, manufacturing, and testing capabilities:

In June 2019, Nikola moved into our state-of-the-art headquarters and R&D facility in Phoenix, Arizona, which consists of more than 150,000 square feet and where *we are capable of designing, building, and testing prototype vehicles in-house*.

(Emphasis added.)

71.    The Proxy touted Defendant Milton's experience and abilities, stating the following as a risk, in pertinent part:

*We are highly dependent on the services of Trevor R. Milton, Chief Executive Officer,* and largest stockholder. *Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola.* If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

(Emphasis added.)

72.    On May 15, 2020, Defendant Milton tweeted the following regarding Nikola's capabilities:

I laugh when articles say Nikola is all talk. 300+ mile battery and 500+ mile fuel cell to be produced by @nikolamoto& @IVECO. *These are real. Our tech is years ahead.* Production starts next year & Factory being prepped now in Germany. Watch while others follow the boss.

(Emphasis added.)

73.    On June 6, 2020, Defendant Milton tweeted the following regarding Nikola's in-house capabilities: "*All the technology, software, controls, E axle, inverters etc we do internally.* We joint venture with those that know the supply chain and manufacturing like Iveco. *We outsource autonomy. We outsource hardware production.*"

74.    On July 1, 2020, Defendant Milton tweeted the following regarding Nikola's in-house capabilities:

We don't make the cells. We make the entire pack like the top guys do. We do have an OEM making our truck but *all internals are Nikola's IP; batteries, inverters, software, ota,* infotainment*, controls, etc. We own it all in house. Just not the plant to build the truck."* (Emphasis added.)

75.    On July 5, 2020, Defendant Milton tweeted the following regarding Nikola's in-house capabilities stating:

"I'm talking about stuff that has no value; cabs, windows, seats or seat belts or ac units. ***All major components are done in house; batteries, inverters, software, controls, infotainment, over the air, etc, you don't care about the truth you're just out to be a keyboard warrior.***" (Emphasis added.)

76.    On July 15, 2020, Defendant Milton tweeted a video and the following:

0-60 in under 5 seconds in the #nikolatwo hydrogen semi truck. Damn that was fast! . ***Edited / professional content coming soon for everyone but here's my raw cell phone behind the scene.***

***Yeah, we'll be posting Go Pro video that's being edited, etc . Be up soon*** showing 0-60 camera time, outside view and also side by side against a diesel truck. This is just a teaser shot

***Actually around 5 seconds. That's 10 seconds to hit 60 and slow down. Around that time, exact timing to be shown in the edited videos coming out next month.*** Side by side diesel comparison, etc. (Emphasis added.)

77.    On July 22, 2020, Defendant Milton tweeted the following regarding Nikola's Tre model trucks:

We break ground on our factory tomorrow. ***We have 5 units coming off assembly line now in Ulm Germany.*** We will be first to market with 300+ mile BEV. Say something nice, do your research or don't comment.

We are breaking ground on our factory tomorrow bud. ***5 Units coming off assembly lines in Germany*** for ***testing*** and we'll be first to market with a 300+ mile BEV. At least be objective. Give props when due. (Emphasis added.)

78.    On August 4, 2020, Nikola filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2020.  The 2020 second quarter Form 10-Q was signed by Defendants Russell and Brady. Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Russell and Brady attesting to the accuracy of the financial statements and the disclosure of all fraud.

79.    The Second Quarter 2020 Form 10-Q touted Defendant Milton's experience and abilities, stating the following as a risk, in pertinent part:

***We are highly dependent on the services of Trevor R. Milton, our Executive Chairman.***

We are highly dependent on the services of Trevor R. Milton, our Executive

Chairman, and largest stockholder. ***Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola.*** If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

(Emphasis added.)

80.     The Second Quarter 2020 Form 10-Q stated the following, in pertinent part, regarding the Company's hydrogen capabilities:

**Overview**

***We are a vertically integrated zero emissions transportation systems provider that designs and manufactures state of the art battery electric and hydrogen electric vehicles, electric vehicle*** drivetrains*, energy storage systems, and hydrogen fueling stations.* To date, we have been primarily focused on delivering zero emission Class 8 trucks to the commercial transportation sector in the U.S. and in Europe. Our core product offering includes battery electric and hydrogen fuel cell electric trucks and hydrogen fuel.

(Emphasis added).

81.     On August 13, 2020, Defendant Milton tweeted the following regarding Nikola's hydrogen production capabilities: "***We currently make our own green H2 for under $4 / kg***. We are open to others down the road but we have our stations going up and need to focus on completing ours first. Then we can work with others as we expand."

82.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) VectoIQ did not engage in proper due diligence regarding its merger with Nikola; (2) Nikola overstated its "in-house" design, manufacturing, and testing capabilities; (3) Nikola overstated its hydrogen production capabilities; (4) as a result, Nikola overstated its ability to lower the cost of hydrogen fuel; (5) Defendant Milton tweeted a misleading "test" video of the Company's Nikola Two truck; (6), the work experience and background of key Nikola employees, including

Defendant Milton, had been overstated and obfuscated; (7) Nikola did not have five Tre trucks completed; and (8) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**THE TRUTH EMERGES**

83.    On September 10, 2020, before market hours, Hindenburg Research published a report describing, among other things, how: (i) the Company claims to design key components in-house, but they appear to simply be buying or licensing them from third-parties; (ii) the Company has not produced hydrogen; (iii) a spokesman for Powercell AB, a hydrogen fuel cell technology company that formerly partnered with Nikola, called Nikola's battery and hydrogen fuel cell claims "hot air"; (iv) Nikola staged a "test" video for its Nikola Two; (v) some of Nikola's team, including Defendant Milton, are not experts and do not have relevant experience; and (vi) Nikola did not have five Tre trucks completed.

84.    On this news, Nikola's stock price dropped approximately 24% in just two days, costing investors over $4 billion.  Specifically, Nikola's stock price dropped from $42.37 per share on September 9, 2020 to $37.57 per share on September 10, 2020. Nikola's stock continued to decline the following day as additional details concerning the alleged wrongdoing came to light, closing at $32.13 per share on September 11, 2020.

85.    On September 20, 2020, Nikola issued a press release entitled "Nikola Board of Directors Announces Leadership Transition: Trevor Milton Steps Down as Executive Chairman; Stephen Girsky Appointed Chairman of the Board[.]" Upon information and belief, Defendant Milton was forced out of the Company due to his involvement in the fraud.

86.    On this news, the price of securities of Nikola plummeted in pre-market trading, from closing at $34.19 per share on September 18, 2020 to close at $27.58 per share on September 21, 2020, a drop of $6.61 per, or nearly 20%.

87.    On October 15, 2020 and October 16, 2020, Defendant Russell indicated in several interviews that Nikola's partnership with GM could fall through.  For example, Defendant Russell stated "We have the ability and we have a base plan of doing it ourselves.

1    If we have a partner, that just enables us to consider going faster and helps reduce the risk,"

2    he said. "We've proven that over the years that we are a partnership company when those

3    things are available to us."

4        88.    On this news, Nikola stock price fell approximately 16% from $23.30 per

5    share at close on October 15, 2020 to $19.55 per share on at close on October 16, 2020.

6        89.    As a result of Defendants' wrongful acts and omissions, and the precipitous

7    decline in the market value of the Company's securities, Plaintiffs and other Class members

8    have suffered significant losses and damages.

9                    **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

10       90.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

11   Procedure 23(a) and (b)(3) on behalf of a class consisting of:

12       (i) all persons or entities, excluding Defendants, that purchased or otherwise
13       acquired the securities of Nikola f/k/a VectoIQ Acquisition Corp. from March
         3, 2020 through October 15, 2020, inclusive, and were damaged thereby; and
14

15       (ii) all shareholders of VectoIQ as of the May 8, 2020 Record Date that were
         entitled to vote on VectoIQ's proposed Business Combination.

16       91.    The members of the Class are so numerous that joinder of all members is

17   impracticable.  Throughout the Class Period, Nikola securities were actively traded on the

18   NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time

19   and can be ascertained only through appropriate discovery, Plaintiffs believe that there are

20   hundreds, if not thousands of members in the proposed Class.

21       92.    Plaintiffs' claims are typical of the claims of the members of the Class as all

22   members of the Class are similarly affected by Defendants' wrongful conduct in violation

23   of federal law that is complained of herein.

24       93.    Plaintiffs will fairly and adequately protect the interests of the members of

25   the Class and has retained counsel competent and experienced in class and securities

26   litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

27

28

94.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b)    whether the Proxy contained false and misleading statements and/or omissions of material facts;

(c)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

(d)    whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

(f)    whether Defendants acted knowingly or recklessly in issuing false filings;

(g)    whether the prices of Nikola securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

95.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class

to individually redress the wrongs done to them.    There will be no difficulty in the management of this action as a class action.

96.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Nikola shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

(b)    As a public issuer, the Company filed periodic public reports;

(c)    Nikola regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Nikola's securities were liquid and traded with moderate to heavy volume during the Class Period; and

(e)    The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

97.    Based on the foregoing, the market for Nikola securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

98.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**

**For Violations of Section 10(b) Of The Exchange Act And Rule 10b-5**
**Promulgated Thereunder, Against Nikola, Milton, Russell, Brady, Girsky and**
**Shindler**

99.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

100.    This Count is asserted against Defendants Nikola, Milton, Russell, Brady, Girsky and Shindler is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

101.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Nikola securities during the Class Period.

103.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Nikola's allegedly

materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

104.    The Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Nikola personnel to members of the investing public, including Plaintiffs and the Class.

105.    As a result of the foregoing, the market price of Nikola securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Nikola securities during the Class Period in purchasing Nikola securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

106.    Had Plaintiffs and the other members of the Class been aware that the market price of Nikola's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Nikola's securities at the artificially inflated prices that they did, or at all.

107.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

108.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Nikola's securities during the Class Period.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

109.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Nikola's business affairs. Because of their senior positions as the directors and officers of Nikola, they knew the adverse non-public information about the Company's false financial statements.

111.    As directors and officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nikola's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

112.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the Proxy and other reports, press releases and public filings which Nikola disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, the controlled the issuance of a false and misleading Proxy and participated in the unlawful conduct alleged which artificially inflated the market price of Nikola securities.

113.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT III**

**Violations of Section 14(a) of the Exchange Act Against**
**Nikola And Girsky**

114.    Plaintiffs repeat and reallege the allegations, except those sounding in fraud. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that

could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

115.    The Proxy, documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

116.    Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy.

117.    Nikola is an issuer of the Proxy.

118.    VectoIQ permitted the use of its name in the Proxy by allowing the Proxy to represent, among other things, that the Business Combination was expected to generate positive returns and was in the best interest of shareholders.

119.    Defendant Girsky signed the Proxy, including the cover letters for the Proxy, and otherwise permitted the use of his name in the Proxy.

120.    By means of the Proxy and documents attached thereto or incorporated by reference therein, Defendants Nikola and Girsky sought to secure Plaintiffs' and other Class members' approval of the Business Combination, and solicited proxies from Plaintiffs and other members of the Class.

121.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by additional material information which arose after the dissemination of these statements and before Business Combination.

122.    The solicitations described herein were essential links in the accomplishment of the Business Combination.   As a result of these solicitations, the VectoIQ shareholders approved the Business Combination.

CLASS ACTION COMPLAINT                                        Case No.

123.    Plaintiffs and Class members eligible to vote on the Business Combination were denied the opportunity to make an informed decision in voting on the Business Combination and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

124.    This claim is brought within the applicable statute of limitations.

125.    By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

1

**JURY TRIAL DEMANDED**

2          Plaintiffs hereby demand a trial by jury.

3

4   Dated: November 3, 2020                    Respectfully submitted,

5                                              ANDREW J. ENTWISTLE
                                               ROBERT N. CAPPUCCI
6                                              JOSHUA K. PORTER
                                               ANDREW M. SHER
7                                              ENTWISTLE & CAPPUCCI LLP

8                                              By:    */s/ Andrew J. Entwistle*

9                                                     Andrew J. Entwistle

10                                             *Attorneys for Plaintiffs Albert
                                               Holzmacher, Michael Wood and Tate*
11                                             *Wood*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT                                          Case No.